THE BANK OF THE UNITED STATES, PLAINTIFFS IN ERROR *vs.*
LEVI TYLER, DEFENDANT IN ERROR.

Action by the indorsees against the indorser of a promissory note, drawn and
indorsed in the state of Kentucky.

The statute of Kentucky authorising the assignment of notes, is silent as to the
duties of the assignee, or the nature of the contract created by the assignment.
It only declares such assignments valid, and the assignee capable of suing in
his own name. But the courts of that state have clearly defined his rights,
duties and obligations resulting from the assignment. The assignee cannot
maintain an action on the mere non-payment of the note and notice thereof,
until the holder of the note has made use of all due and legal diligence to re-
cover the money from the drawer; whose engagement is held to be, that he will
pay the amount, if after due and diligent pursuit the maker is found insolvent.
[380]

The principles of the law of Kentucky relative to the liability of indorsers of
promissory notes, and proceedings to establish the same, as settled by the de-
cisions of the courts of Kentucky. [381]

A judgment does not bind lands in the state of Kentucky. The lien attaches
only from the delivery of the execution to the sheriff. It then binds real and
personal property, held by legal title. An execution, returned, is no lien on any
property not levied on; and no new lien can be acquired, until a new execution
is put into the hands of the sheriff; and none can issue while a former levy
is in force. Any delay then by the assignee, enables the debtor to alienate
his property in the interval between judgment and the execution reaching the
sheriff, as well as between the return of one and the lien acquired by a new
execution. [383]

By the law of Kentucky, no equitable interest in real or personal property,
unless it is held by mortgage, deed of trust, or other incumbrance, can be taken
in execution. A capias ad satisfaciendum is the only mode by which the
equitable estate of a debtor or his choses in action can be in any way reached
by any legal process. It may be the means of coercing the payment of the
debt, and it must therefore be used. The return of nulla bona to an execution
is in that state the only evidence of there being no property of the debtor on
which a levy can be made. It is not evidence of there being no equitable in-
terest which is beyond the reach of such process; or of his not having that kind
of property, on which a levy can be made. [383]

After judgment obtained in the circuit court of the United States against the
drawer of the note, a capias ad satisfaciendum was issued against him by the
holder, and he was put in prison. Two justices of the peace ordered his dis-
charge, claiming to proceed according to the law of Kentucky in the case of
insolvent debtors; and the jailor permitted him to leave the prison. The jailor
made himself and his securities liable for an escape, by permitting the prisoner
to leave the prison. Held, that the neglect of the holder of the note to pro-
ceed against the jailor and his securities, prevents his making of the indorser
liable for the amount of the note. [388]

The court find no express decision of the courts of Kentucky enjoining a plaintiff who has sued the drawer of a promissory note, and intends to charge the indorser, to proceed against a jailor and his sureties, when the defendant has been suffered to escape; yet by the spirit of all the decisions, he is bound to do so. The general principle of all the cases is, that a plaintiff must pursue with legal diligence all his means and remedies, direct, immediate or collateral, to recover the amount of his debt from the drawer of the note, or of any one else who has put himself, or has by operation of law been put in his place. [390] The decision of this court in the case of The Bank of the United States vs. Weisiger, examined and confirmed.

ERROR to the circuit court of Kentucky.

This was an action, by the bank of the United States, against Levi Tyler, upon two promissory notes; one for three thousand nine hundred dollars, dated the 2d of May 1821, and payable sixty days after date, drawn by Anderson Miller, in favour of John T. Gray. It was negotiable, and payable, without defalcation, at the office of discount and deposit of the bank of the United States at Louisville, Kentucky, for value received. John T. Gray assigned the note to Levi Tyler, and Levi Tyler assigned it to the bank.

The other note was of the same date, for three thousand eight hundred dollars, payable to Samuel Vance; assigned by said Vance, and by the defendant. In all other respects, it was like the note above stated.

On the 24th of September 1821, suit was brought by the bank against the drawer, Anderson Miller, in the circuit court of the United States, for the district of Kentucky, for the first mentioned note; and judgment was obtained at the November term 1821.

On this judgment a fieri facias issued, bearing date the 29th of December 1821, returnable on the first Monday of March, being the 4th day of the month following, which was in the hands of the marshal on the 19th of January 1822; and the plaintiffs introduced as a witness the clerk of the court, who stated; that it had been his uniform habit, before and since the obtention of the said judgment, to issue executions on all judgments obtained at the last preceding term, and place them in a window of his office, from whence it was the habit and custom of the marshal to take them. That it generally required from twelve to sixteen days after the

rising of the court, to prepare and issue the executions of the preceding term. That at the November term of the court, at which the before mentioned judgment was obtained, the court adjourned on the 17th of December.

To this fieri facias the marshal returned a levy, and that he had not time to sell before the return day. The return was filed the 28th of March 1822. On the 3d of April 1822, a venditioni exponas issued, returnable the first Monday in June. It was returned on the 17th day of June, "unsold for want of bidders," and the sale was postponed; and alias venditioni exponas issued, tested the 17th of June, returnable on the first Monday in September, returned on the 13th. The sales, amounting to ten dollars and fifty cents, were credited to another execution.

The 26th of September 1822, another fieri facias issued, which was levied on slaves, and sale made. It was returned the 9th of December 1822. The proceeds of the sale were one thousand three hundred dollars.

The 19th of December 1822, another fieri facias issued, and returned, "levied on property mentioned, and not sold for want of time." This was returned on the first Monday in March 1823.

The 20th of March 1823, a venditioni exponas issued, and was returned "unsold, for want of bidders." The return was filed on the 30th of June, returnable the first Monday in June.

The 1st of July 1823, another venditioni exponas issued, and was returned "unsold, for want of bidders." The return was filed the 12th of September 1823.

The 19th of September 1823, another venditioni exponas issued, and the property was sold. The proceeds amounted to four dollars and fifty cents. It was returned the 19th of December 1823.

The 19th of December 1823, another fieri facias issued, to March 1824, and was returned, "no property found to satisfy the execution, or any part thereof." Returned the 16th of March 1824.

The 16th of March 1824, a capias ad satisfaciendum issued, under which the defendant was committed; and so

returned on the 26th of April 1824. The commitment was to March 1824.

The proceedings in the suit against Anderson Miller on the other note were also given in evidence. They also terminated in his committal to prison.

On the 27th of March 1824, two justices of Kentucky discharged Anderson Miller from prison.

Upon this evidence, the court instructed the jury to find for the defendant; and the jury found accordingly. The plaintiffs excepted, and the judge signed a bill of exceptions.

The plaintiffs offered witnesses, to prove, that Anderson Miller was notoriously insolvent when the note fell due, and had so continued ever since. The court rejected the evidence, and the plaintiffs excepted. This exception is stated in the bill.

The plaintiffs contend, that the court erred in charging the jury to find for the defendant; because they say it was fully proved that due diligence was used against the drawer; and the remedies afforded by the law were exhausted, without obtaining the money, and therefore they were entitled to recover from the indorser.

They contend, also, that, under the circumstances of this case, the evidence offered of Miller's insolvency, ought to have been received.

The case was argued by Mr Sergeant, for the plaintiffs in error; and by Mr Wickliffe and Mr Bibb, for the defendant.

Mr Sergeant stated, that the first question was, whether due diligence had been used.

The second, whether the proceedings have been carried so far as to establish the right of holders to sue the indorser or assignor of the note.

1. The principles of the case were settled at the last term, in the case of The Bank of the United States vs. Weisiger, 2 Peters, 331. They decide this point, at all events; and it is thought the whole case.

It is to be remarked, that it appears on the face of these notes, that they were drawn for the purpose of discount;

they were indorsed for the same purpose; and they were discounted for Levi Tyler, for value received by him.

The diligence used in the commencement of the suit appears from the statement of the case. It was brought to the first term, and in time to obtain a judgment at that term. No case in Kentucky requires more than this. The holder is not obliged to run a race against time; nor to sue the first term, if judgment could not be obtained. The general phrase is, "it must be in reasonable time." Trimble vs. Webb, 1 Monroe, 100. Oldham vs. Bengan, 2 Litt. 132. Collyer vs. Whitaker, 2 Marsh. 197.

Bail was demanded, which would be necessary if non est inventus was returned, 1 Bibb, 542, but not otherwise. 2 Marsh. 197. Tyler was the bail.

2. Judgment was obtained the first term, and a fieri facias issued on the same day, and was on the same day in the hands of the sheriff. 2 Peters, 333, 348, 349.

The fieri facias in the second case is said not to have been in the marshal's hands until the 9th of January; but this is probably a mistake; and if it was not, it was in good time. 2 Peters, 348. It was also immaterial; because the other fieri facias covered the whole property, as the return shows; and there was nothing to levy upon.

Was it necessary to issue two writs of fieri facias? From that time forward there was unceasing diligence; the process being followed up as fast as it was returned. It is true that the marshal returned he had not time to sell; but this was not because the writ came too late; it was because he found nothing to levy upon until the 28th of September 1822; or perhaps it is the ordinary course. Tyler was conusant of all this, for he was one of the defendants in one of the three executions.

Suppose however the officer did wrong; are the plaintiffs responsible for that? It has never been so settled. Postlethwaite vs. Garrett, 3 Monroe, 346. Nothing was lost by it; for the property was secured, such as it was, and a venditioni issued immediately in each case. The proceedings went on until the drawer was committed to prison; and that was all that could be done, and no more was required.

Young *vs.* Cosby, 3 Bibb, 227. Here the diligence was fairly exhausted and at an end. The bail was discharged by this commitment, and there was no recourse to him.

Have the proceedings been carried so far as to entitle the holder to sue the indorser or assignor?

It is contended that there is an immediate right of action against the indorser by the holder, after the confinement of the drawer, which cannot be divested but by his own act or consent. He is not bound to take a single step to keep the drawer in prison. Young *vs.* Cosby, 3 Bibb, 227. Authorities upon this principle, 1 Marsh. 535. 2 Bibb. 34.

All this has been done; and the burthen of proof that any thing has been omitted is thrown upon the defendant. The plaintiffs are not bound to protract the imprisonment one moment. Bank of the United States *vs.* Weisiger, 2 Peters, 331. In Virginia the requirements are far short of this. Violett *vs.* Patten, 5 Cranch, 142.

Ought the law of Kentucky, which professes to be the law of Virginia, to be carried further than judicial decisions in that state have carried it? The point to be established is the insolvency of the drawer; or his inability to pay, to a reasonable extent. Not that every possible chance of getting the money by any means is exhausted. That point was reached.

But it is insisted, that a new career was to be begun. It is founded upon this argument, that the justices had no authority to discharge; that it was therefore an escape, and the jailor, and his sureties are liable.

Supposing all this to be correct, is it necessary for the plaintiffs to proceed? It will be reeollected that there was no request to this effect. There is no decided case which gives any countenance to the position. The case of a replevy bond has no analogy.

But this proceeding would be collateral to the suit. It would be a new departure on a different line of operations, the first suit being only the base.

Were the jailor and his sureties liable by the Kentucky law? This cannot be decided for want of evidence. Were there any sureties of the jailor, and to what amount?

Were they responsible men, or were they insolvent? Was the pursuit worth the cost? The defendant should have shown this by evidence. He was to ask the pursuit to be undertaken, at his cost and for his account. The claim on the plaintiffs seems wholly inadmissible.

But the question presented is one of some peculiarity. Is there an escape, and who is liable for it? This is a new question, considering the circumstances. The United States have no prison in Kentucky, nor is the marshal furnished with any place of imprisonment in Kentucky, under his own jurisdiction. The jailor is not of his appointment. The moment he delivers a prisoner to the jailor, his authority is at an end.

The matter depends on the resolutions of congress, and the acts of Kentucky. Resolution of September 23d, 1789. Ing. Ab. 489. Of March 3d, 1791, Ing. Ab. 496. Of March 3d, 1821, Ing. Ab. 507. Acts of Kentucky, 2 Litt. 57, 369. The marshal therefore cannot be liable. Is the jailor? He derives his authority from the state of Kentucky, and this discharge is under the law of Kentucky. It is a complicated question.

Two questions present themselves:

1. Is it required by the obligation of due diligence in Kentucky, to issue a capias ad satisfaciendum for the purpose of imprisonment, since the act abolishing imprisonment for debts? Does the law require that to be done, which the same law declares ought not to be done?

2. Can a citizen of Kentucky, and one of the law makers, insist that this ought to be done? Suppose it to be clear that the plaintiffs had a right of action, were they bound to pursue it?

This is a question of evidence in the case, and it is contended the evidence was inadmissible. Violett vs. Patton, 5 Cranch, 142. 2 Marsh. 255. 2 Bibb, 34. 3 Bibb, 227.

Mr Wickliffe and Mr Bibb, for the defendant.

This court has uniformly expressed its disposition to adopt the construction which the courts of a state have given of the laws of the state. Elmendorf vs. Taylor, 10 Wheat. 160.

In this opinion the principle is clearly recognized, that the judicial department of every government is the appropriate expounder of the legislative acts of the government.

The law of Kentucky in relation to promissory notes, is applicable to those notes which are the foundation of this action; for the notes were drawn and executed in that state, and there assigned. The law of Kentucky is different from the usual commercial law. The responsibility of an assignor is to accrue after due diligence, by suit, against the drawer. Smallwood *vs.* Woods, 1 Bibb, 544. Drake *vs.* Johnson, Hard. 223. Duncan *vs.* Littell, 2 Bibb, 35, 290.

The statute of Kentucky which authorises the assignment of such notes, omits the words "in the same manner as bills of exchange" contained in the statute of Anne. 1 Dig. Laws of Kentucky, 99.

The declaration in this case treats the notes as assigned under the law of Kentucky, and the attempt of the plaintiff has been to make out a case of diligence under the Kentucky law; and this is essential to a recovery.

By the decisions of the supreme court of Kentucky, the responsibility of an assignor of a bond or note is made to depend upon due diligence by suit against the maker to compel payment. The assignor must use every compulsory process afforded by law; and he must use it until the insolvency of the maker of the note is established, until the suit and all the incidental remedies, however ramified, prove insufficient. Smallwood *vs.* Woods, 1 Bibb, 542. Hogan *vs.* Vance, 2 Bibb, 35. 4 Bibb. 287. Marsh. 523. 3 Marsh. 60. 1 Mon. 103. 5 Litt. 331. 3 Bibb. 7. 1 Marsh. 230.

From these cases the consequences are inevitable : that a failure to sue out successive executions in due time until the officer returns " no property" is negligence; that the first and every successive process must be diligently pursued, until the property is exhausted and the body taken; and all the remedies have been employed and have failed.

Due diligence is a question of law to the court, when the facts are ascertained. M'Kenney *vs.* M'Connel, 1 Bibb. 239. Smallwood *vs.* Woods, 544.

[Bank of the United States *vs.* Tyler.]

In the case before the court, the facts were ascertained by the plaintiffs' evidence, upon which the motion for instructions which prevailed was founded; the plaintiff produced none. The rules of the law of Kentucky being fully established upon the authorities cited, the principles they enforce will be applied to this case.

1. By showing that the plaintiffs as assignees have not used due diligence against the maker, between the judgment and the capias ad satisfaciendum.

2. That the plaintiffs having failed to proceed against the jailor for an escape, cannot have recourse to the assignor.

1. The plaintiffs have been guilty of crassa negligentia, between the judgment and the capias ad satisfaciendum.

If suit must be brought to the first term (4 Monroe, 15); why so? Because execution would otherwise be delayed. Not only suit, but execution must be sued in due time; and although a fieri facias was sued in due time, yet a delay in pursuing the execution by capias ad satisfaciendum was adjudged negligence. 2 Marsh. 523. What is due diligence; what is negligence in proceedings under executions; must be tested by the properties and effects which the law gives to executions in respect to three subjects.

1. As to priority between creditors, where all cannot be satisfied.

2. In overreaching alienations by the debtor to bona fide purchasers.

3. As to the command to the officer to levy or compel the debtor, or the obedience due by the officer to the precept.

1 and 2. As to priority of lien amongst creditors, and the lien which overreaches alienations by the debtor; the statutes of Virginia and of Kentucky declare that the property shall be bound only from the delivery of the execution to an officer; and to that end he is required to indorse the time of delivery. Laws of Virginia, 1748, p. 276, sec. 10. Laws of Kentucky, 1 Dig. 513, 483.

The common law doctrine of relation to the beginning of the term by judgments is abolished, and the lien commences as has been stated.

By the express provisions of the statutes, and decisions under them, it appears :

That if several executions issue at the same time against the same debtor, and are delivered to the same officer, that which comes first to the officer's hands must be first satisfied, and it does not bind until delivery.

An execution issued and delivered, creates no lien after the return day, except upon such property as may have been seized. Tabb *vs.* Harris, 4 Bibb, 29. Daniel *vs.* Cockpen's Executors, 4 Bibb, 532.

Thus, diligence in delivering the execution to the officer, is of the highest importance. In the exercise of the federal jurisdiction of the courts of the United States, the obligation to pursue with the utmost diligence the delivery of the execution, is more important ; for between conflicting jurisdictions, the officer who first levies has the right to retain the property.

Due diligence then enjoins a speedy delivery of the process to the officer, and that the lien shall be preserved by keeping the execution in the hands of the officer until a return of the property.

By the statutes of Virginia and Kentucky, one execution can be sued after another, if the first be not returned and executed. The great object of this law is, that the plaintiff may maintain a continued and unbroken lien upon the debtor's property.

The laws of Virginia and Kentucky upon these points are the same, and the practice in the circuit court of the United States has been to mould their executions so as to embrace lands as well as goods and chattels ; and this is shown by the decisions of this court in Wyman *vs.* Southard, 10 Wheat. 1. Bank of the United States *vs.* Halstead, 10 Wheat. 57. The question is therefore disentangled of any difficulties in the forms of the execution.

To apply these principles to the facts of the case ; and first, as to the note for three thousand nine hundred dollars.

In the executions against Miller, the plaintiffs were guilty of gross negligence;

The first execution is tested the 29th of December 1822, and there was a delay of twenty-one days between the test

and the delivery; and during this delay, other creditors might have come in, and the debtor might have aliened his property. This execution was levied on specified property, without any return that there was no other; and a subsequent execution was levied on other property than that, which was sold for one thousand three hundred dollars. Had the execution been issued earlier, the officer might have sold before the return day.

Although the fieri facias was returnable the first Monday in March, the venditioni to compel the officer to sell was delayed until the 3d of April 1822. When that was delivered does not appear.

That venditioni exponas was returned " not sold for want of bidders, and sale postponed by agreement," indorsed on execution No. 2130; but when that was returned does not appear.

The next venditioni exponas to compel the sale, was not issued until the 17th of June 1822; and the property was sold on the 1st and 2d of July.

From the time of this sale, (2d July,) the plaintiff delayed to put another fieri facias into the officer's hands until the 1st day of October : ninety days were suffered to elapse without any effort.

Had the plaintiff been vigilant, he would immediately after the sales in July have issued another fieri facias to bind the debtor's property.

That there was other property appears by the execution and sale on this second fieri facias; and also by the levy on the third fieri facias.

These delays were so great; there was such a want of vigilence and due superintendence; such was the careless manner in which the executions were suffered to limp and halt and drag, by intervals, between the one execution and another; that it has taken from the 29th of December 1821, to the 16th of March 1824, a period of twenty-six months and upwards, before the capias ad satisfaciendum issued.

During these twenty-six months, there were three levies and three sales; and the process upon which these three levies and sales were compelled, were at intervals which evince a total inattention on the part of the plaintiffs.

[Bank of the United States vs. Tyler.]

His own testimony shows that he relied on the clerk and the marshal.

Neither clerk nor marshal have, by law, authority to issue executions, unless ordered.

They are not, virtute officii, bound to act as agents of the plaintiff, in ordering and delivering executions. If they do so, it must be by special authority given by the plaintiff beforehand, or by adopting their acts afterwards. If the plaintiff has chosen to rely on the clerk and the marshal, to do that for him which it was his duty to do, he must abide the loss by such delays as have been suffered. The clerk is to issue execution, when ordered, and of the kind directed, whether fieri facias or capias ad satisfaciendum or elegit or levari facias; the marshal is bound to receive such when offered to him. It is the business of the plaintiff to direct the clerk to issue, and it is the business of the plaintiff to deliver to the marshal the execution when issued. It is no excuse for the delays which have happened, for the plaintiff to say, it was the clerk's habit to issue executions and put them into a window in his office, and it was the habit of the marshal to call and get them. A reliance upon such habits shows the want of that superintendence and vigilance which was due from an assignee who expects recourse against the assignor.

It is no excuse for the lapse of time between the return day of one execution, and the teste of the ensuing execution, to say that the marshal did not return the execution at the return day. He was bound to return the execution according to the command of the precept; and was subject to a fine and penalty for failing to return the precept at the day appointed.

At each rule day on which the process was returnable, the plaintiff had a right to call for it, to demand it; to proceed against the officer for a failure to return the precept according to its mandate. Moreover, whether returned, or not, he had the right by law on the rule day, and even before, to sue out any other execution and deliver it, so as to preserve his lien. The officer, upon such second execution, would of

course regulate his conduct by what he had done on the previous execution.

So much for the delay between judgment and capias ad satisfaciendum on the note of three thousand nine hundred dollars, by Miller to Gray, who assigned to Tyler, who assigned to the bank.

The two notes, and the process upon them, cannot be brought to the aid of each other. The parties are different, and each must be pursued independently. 2 Marsh. 523, 198, 199. Upon the principles already stated, and supported by authorities, the proceedings against the maker of the note for three thousand eight hundred dollars, are liable to charges of the most gross and entire negligence.

The fieri facias issued on the 29th of December 1821, and did not come to the hands of the marshal until the 19th of January 1822, nearly one month after its issue. From the return day, the first Monday in March, until the 3d of April 1822, there was no movement, when a venditioni exponas issued, returnable in June; and then there was no sale, but this was postponed by agreement. The next venditioni was issued on the 17th of June, and sales were made on the 1st and 2d of July; and from that time the process was suffered to sleep until the 28th of December 1822, a period of one hundred and seventy days. Even between the return day in September, and the teste of the next execution in December, there was an interval of one hundred and eleven days.

2. The defendant having failed to proceed against the jailor for the escape, cannot have recourse to the assignor.

The cases before cited are adjudicated upon the principle, that not only the direct remedy by suit, but the incidental remedies and securities given by law, and arising in the course of the suit, must all be resorted to. The remedy must be pushed in all its ramifications. Owings *vs.* Grimes, 5 Litt. 331. Parker *vs.* Owings, 3 Marsh. 60. M'Ginnis *vs.* Burton, 3 Bibb, 7. Campbell *vs.* Hopson, 1 Marsh. 230.

That the jailor and his sureties are liable for an escape cannot be denied. The discharge was altogether unlawful: the jailor should have resisted, or have refused to obey the

order to discharge the drawer. Cited Hubbard *vs.* New-house, 1 Bibb, 555.

The law of Kentucky gives the use of the prisons of the state to the United States; and declares it to be the duty of the jailor to receive persons committed under the authority of the United States, and to keep them until discharged according to law; 2 Dig. 679; and the jailor gives bond with sureties.

The statute of Kentucky abolishing imprisonment for debt, does not operate upon the process of the courts of the United States. The justices had no colour for the jurisdiction they assumed.

The plaintiffs have a remedy for the escape, and no person but the plaintiffs can pursue it. It is a remedy incidental to the action against the drawer, and they should have employed it before they instituted this suit.

The case of the Bank of the United States *vs.* Weisiger has no analogy to this. There the complaint against the plaintiff was, that he had been too swift.

Mr Sergeant, in reply, said; it was admitted that the suits had been regularly brought, and in good time; and the only question upon this point was, whether the subsequent proceedings were also in time. He contended that they were, upon the authority of adjudged cases in Kentucky : and it is not necessary to go further than the judicial decisions of that state had gone.

As to the obligation to pursue the officer for an escape, the claim is ungracious, after charging the plaintiff with the length of his pursuit.

No decision was ever yet made upon which the position assumed rests. If there is no decision, there is no such obligation. The law of the case is one of judicial proceedings. No law exists, unless found in these decisions. But it has been decided that the holder of a note is not bound to pursue extraordinary remedies. This is an extraordinary remedy.

And why should it be required? The officer is guilty of

no injury; for the insolvency of the drawer of the note is manifest. It cannot be doubted.

Mr Justice BALDWIN delivered the opinion of the court.

In this case the plaintiffs sue, not as the indorsers of two notes, negotiable under the statute of Anne, which has never been adopted in Kentucky, but as assignees for a valuable consideration of promissory notes, which are assignable by the laws of that state, and on which the assignee may sue in his own name. 1 Kentucky Digest, 99.

The first note was drawn by Anderson Miller, dated at Louisville, May 2, 1821, for three thousand nine hundred dollars, in favour of John T. Gray, negotiable and payable sixty days after date, at the office of discount and deposit of the Bank of the United States, Louisville, Kentucky, for value received. The note was assigned in the following manner. "For value received, I assign the within note to Levi Tyler or order, John T. Gray, by Levi Tyler, his attorney." "For value received, I assign the within to the president, directors and company of the Bank of the United States, Levi Tyler."

As this note was drawn, assigned, and payable in Kentucky, the obligations and rights of the parties must depend on the laws of that state.

The statute authorising the assignment of notes is silent as to the duties of the assignee, or the nature of the contract created by the assignment. It only declares such assignment valid, and the assignee capable of suing in his own name; but the courts of that state have clearly defined the rights, duties, and obligation resulting from the assignment. The assignee cannot maintain an action on the mere non-payment of the note and notice thereof, or of a protest to the assignor, until the holder of the note has made use of all due and legal diligence to recover the money from the drawer. But if this fails, then the assignor may be resorted to on his assignment; which is held to be an engagement to pay the amount of the note, if, after due and diligent pursuit, the maker is insolvent. This contract results from the act of assignment, without any express agreement to be an-

swerable; the law is the same, whether this contract is expressed in terms, or is implied from the assignment; the rights and duties of the parties are the same in both cases. 4 Bibb, 286. 1 Marsh. 229. This case may then be considered as an assignment of a promissory note, with an express promise by the assignor to pay if by legal process and due diligence the assignee is unable to recover the amount due from the drawer. Viewed in this light the case is more readily comprehended.

The means which the assignee is bound to use, the time within which he must commence, and the diligence with which he must pursue his legal remedies against the maker, and the extent to which he must carry them, have been the subject of much litigation and discussion in the courts of Kentucky: they have however adopted the following as principles, which must be taken to be the law of the state.

That the assignee is not bound to run a race against time, or to use extraordinary means; that he is not required to prosecute a drawer or obligor farther than a man of ordinary prudence and diligence would do in a case where he was solely and exclusively interested. But in order to bring himself within these rules, he must commence a suit against the drawer at the first term after the note becomes due, if a judgment could be obtained then. He must sue within such time, before the term, as will authorise him to procure judgment. After suit is brought, he must prosecute it to judgment without delay, or giving time to the maker of the note. Though he is notoriously insolvent, and dies on the third day of the first term after the note becomes due, and no administration is taken out on his estate, the assignor is discharged, if no suit has been brought. After judgment, there must be the same diligence in pursuing the debtor's property by execution as in the commencement of the suit. There must be no delay in putting the execution into the hands of the sheriff, or in making sale of the property levied on; he must continue the process of execution until the property of the drawer is exhausted, and the sheriff returns nulla bona to the last execution; and after his insolvency is thus ascertained, a capias ad satisfaciendum must be taken for his body;

and if he is committed, the assignee must show what has become of the debtor, and how he has been discharged.

If the debtor assigns property, it must be sold. If property is taken in execution, and replevin bond given, the bond must be put in suit; if there is bail to the action, and the principal cannot be taken on a capias ad satisfaciendum, the bail must be pursued; and all incidental and collateral remedies, which may accrue to the assignee, must be adopted and prosecuted; and the discharge of the drawer by the insolvent act, at the suit of a third person, will be no excuse for any relaxation in the diligence required to fix the assignor; who is suable only after the exhaustion of all legal means of obtaining payment.

The cases on this subject have been collected in a note in 2 Peters, 338, 339, 340; and were all cited and ably commented on by the counsel on both sides.

It is believed that the principles which exact such an unusual degree of vigilance from the assignee, are peculiar to the jurisprudence of Kentucky; but they have been established by a long series of cases adjudged in their highest courts for many years; they have long formed the law of that state as to notes and bonds assigned under their statute; and the legislature has not thought proper to change it. The courts in Virginia have given a very different construction to their statute on the same subject; and there are no decisions in any state which have extended the rule of diligence so far. But this court has always felt itself bound to respect local laws, however peculiar, in all cases where they do not come in collision with laws of higher authority and more imposing obligation. Such a case is not presented in the record now under our consideration.

These are the duties imposed by the law of Kentucky on the assignees of promissory notes, before they can commence a suit against the assignor on his promise. These rules are the law of this case; and although in our opinion they carry the doctrine of diligence to an extent unknown to the principles of the common law, or the law of other states, where bonds, notes, and bills are assignable, we must adopt them as the guide to our judgment. They must be considered with

a reference to the laws of Kentucky respecting judgments and executions, in order to form a correct opinion of their true character. A judgment does not bind land in that state; the lien attaches only from the delivery of an execution to the sheriff; it then binds real and personal property, held by a legal title. An execution returned, is no lien on any property not levied on; and no new one can be acquired until a new execution is put into the hands of the sheriff; and none can issue while a former levy is in force. 6 Kentucky Digest, 485, sec. 8. Any delay then by the assignee enables the debtor to acquire, hold or alienate his property in the interval between judgment and the execution reaching the sheriff; as well as between the return of one and the lien acquired by a new execution. There is therefore more reason in exacting strict diligence on the part of the assignee, than in those states where real estate is bound by a judgment without an execution. On general principles, it is certainly a rule of very great rigour to require a capias ad satisfaciendum to be issued and served after a return of nulla bona. But as, by the law of Kentucky, no equitable interest in real or personal property, except where it is held or covered by mortgage, deed of trust or other incumbrance, can be taken in execution; a capias ad satisfaciendum is the only mode by which the equitable estate of the debtor or his choses in action can be in any way reached by any legal process. 1 Kent. Dig. 504, sec. 5, 505, sec. 6. It may be the means of coercing the payment of the debt, and it must therefore be used. The return of nulla bona to an execution, is, in that state, evidence only of there being no property of the debtor on which a levy can be made. It is not evidence of there being no equitable interests, which are beyond the reach of legal process; or of his not having that kind of property on which no levy can be made. A debtor, confined by an execution from the federal courts, can only be discharged under the insolvent act of congress passed January 1800; the provisions of which are effectual to compel a disclosure of all his property. In the language of this court, " the coercive means of this law are to be found in the searching oath to be administered, and in the fear of a

prosecution for perjury, and recommitment; in the same action. Bank of the United States *vs.* Weisiger, 2 Peters, 352.

The creditor has a right to use these coercive means; and where he intends to make the insolvency of the debtor the ground of a resort to the assignor of the note on which the judgment was obtained, he is by the principles of the Kentucky decisions bound to use them to the full extent authorised by the laws of that state, as expounded by its highest judicial tribunals.

In discarding from our minds all considerations unconnected with the peculiar local law which governs this case, and considering it in all its bearings on both parties; we are not prepared to say that either has any right to complain of the severity of the rules which impose on them their respective obligations. If the law merchant were to govern, the plaintiff would be without remedy.

Suing as the indorser of a negotiable note, he must fail, for want of a protest or demand of payment of the drawer, and notice to the indorser. The diligence exacted of him is quite as extreme, if not more so, as when he sues as assignee. He must not give the drawer time for one day beyond the days of grace, or what local usage permits. His notorious insolvency; his being discharged as an insolvent debtor or a certified bankrupt; will not excuse the holder. This court have decided at this term, in the case of The Bank of the United States *vs.* Magruder, that where a drawer of a note dies before it becomes due, and the indorser administers on his estate, demand of payment and notice to the indorser are indispensable. No decisions in Kentucky on assigned notes establish a more rigid doctrine than is applicable to indorsers by the law merchant. In such cases demand and notice are required to fix the indorser, because the debtor may pay by the interference of friends; not because he is supposed to have the means of doing it otherwise. It is too late to inquire into the reason of these rules; which have become settled and established as the general law of negotiable notes in the commercial world, and of assignable notes in Kentucky. They must be submitted to as the law of the contract into which

the parties respectively enter, on becoming indorsers in the one case, and assignees in the other. If it is not going beyond the principles of the common law of England and this country, it is at least extending them to their utmost limits, to say that the assignor of a note, without fraud, or a promise to pay in the event of the insolvency of the drawer, should be liable by the mere effect of the assignment; and that there is no difference between his assigning with or without an express promise. It is at least testing the contract of assignment by the rules of the summum jus. Neither the statute of Anne or of any of the states of this union, making notes assignable (so far as is known), expressly impose on the assignor any obligation which did not attach to the assignment of a chose in action at common law. Such assignments are recognized; and though the assignee cannot sue in his own name, his rights are as much protected in courts of law as those of assignees, by virtue of the statute. 3 Bibb, 293. 4 Bibb, 557. It is not easy to assign any sound reasons for construing the assignment as, per se, importing a higher obligation in the one case than the other. But the law of Kentucky has given this effect to assignments of notes under the statute of that state; and as the plaintiffs cannot sustain this action in their own name without the aid of the law, they must submit to the conditions which the settled judgments on the action have imposed on them. If, in availing themselves of this strict obligation imposed on the assignor, they find themselves compelled to use a corresponding degree of vigilance on their part, exceeding that which is required in other states under similar statutes; this court cannot afford them an exemption from its exercise. The local law is clearly settled, and we must submit to it; however we might be inclined to construe the law, if it were now open to a construction more consistent with that which has been uniformly given to statutes authorising the assignment of bonds, bills and notes.

In the application of these rules to the first note which is the subject of this action, the defendant admits, that up to the time of issuing the first execution, there has been no want of due diligence on the part of the plaintiff; but he alleges, that from that time, there was unnecessary delay in various

particulars, which have been pointed out and dwelt upon with much earnestness. As the statement of the case contains the teste, the return day, the day of the return of each execution, and the time of their coming to the hands of the marshal; it is unnecessary to examine in detail the alleged instances of negligence by the lapse of time : but there is one rule for which the defendant contends, which deserves some more particular notice.

By the fifth section of a law of Kentucky, passed in 1811, it is made the duty of the courts of that state, to appoint by rule of court, some day in each month as a general return day of execution. The provisions of this law having been carried into effect; the defendant insists, that in the exercise of the legal diligence incumbent on the plaintiff, he was bound to take out his execution returnable on some rule day, and attend at the office to watch its progress and effect. We think this would be applying the doctrine of diligence with unreasonable strictness. We find no decision which warrants the extension of it to so extreme a point; and we are not disposed to go one step in advance of the principles heretofore adopted. The case of the Bank *vs*. Weisiger is conclusive on this part of the defendant's case ; it was there settled, that a lapse of thirty-six days between the judgment and the delivery of the execution to the marshal, did not amount to that want of diligence which exonerated the assignor of the note on which the judgment was obtained.

We have been furnished with no adjudged cases in Kentucky, which fix any definite time within which an execution must be made returnable. On examining the executions which have issued on the judgment on the first note, they are all returnable within three months from their teste; and no period of three months has been suffered to elapse, within which an execution has not been in the hands of the marshal, unless when writs of venditioni exponàs were out: and they appear to have issued in all instances within that period. The greatest time which has intervened between the issuing of an execution and placing it in the hands of the marshal, appears to be thirty-one days; and from the return of one execution or venditioni, until the issuing of another, thirty

days : and we are not aware that in any of these cases there is any decision that this would be a want of diligence in the assignor. In the absence of any such decision, and feeling at liberty to decide upon them as open questions, we are of opinion, that the plaintiff, in the proceedings subsequent to the judgment, has at no time omitted to pursue the maker of this note with all the diligence which the law required of him. On this part of the case, we think the decision of this court in the case of the Bank of the United States *vs.* Weisiger is strongly applicable. That was a case of the assignee against the assignor of a promissory note. Judgment was entered November term 1821. Execution issued on the 29th of December; was placed in marshal's hands on the 19th of January, thirty-six days from the entry of judgment; returned nulla bona, at March term 1822, the 3d day of the month; and a capias ad satisfaciendum issued on the 11th of April 1822, thirty-eight days from the return day of the fieri facias. This was held not to be such a want of diligence as exonerated the assignor. This decision seems to us to cover all the ground assumed by the plaintiff, up to the time of the discharge of Miller from his imprisonment on the capias ad satisfaciendum; and thus far we think he has done or omitted no act which has impaired his right of action.

. It remains now to consider the last allegation of the want of diligence imputed to the plaintiff, and its effect on the suit. Miller was arrested and imprisoned on the 27th of March 1824; and on the same day was discharged by the jailor, on the order of two justices of the peace, acting or pretending to act under a law of Kentucky, passed in 1820, (1 Kent. Dig. 503, sec. 1 and 3), abolishing imprisonment for debt, and authorising a justice of the peace, on application of any person in jail or in prison bounds, on reasonable notice to the party at whose suit he has been committed, to issue an order for his discharge.

. It is not necessary to inquire whether this law would apply to process from the federal courts; so as to legalize the discharge of a prisoner from the execution issued in this case, and protect the jailor and his sureties from an action by the plaintiffs for an escape. The laws of Kentucky on

this subject are too clear to admit of a doubt: they authorise the discharge of a debtor from imprisonment, on making a schedule of his property, surrendering it to the use of his creditors, and taking the oath prescribed. 1 Kent. Dig. 490, 491, 492, act of 1819; 564, act of 1821.

It was under this law that the justices acted in issuing the order of discharge. But it could not apply to a commitment by the marshal, under an execution from the federal courts; because an express provision was made by prior laws, which made it the duty of the jailor to safely keep such prisoners, until they shall be discharged according to the laws of the United States. 2 Kentucky Digest, 676. The act of 1798 provides; that jailors shall receive into their custody all persons committed under the authority of the United States, and keep them safely, until discharged by the due course of the laws of the United States; and the jailor is subject to the same pains and penalties for neglect of duty, as if the commitment had been by state authority. By the act of 1800, the marshal of the United States has a right to use any prison for the imprisonment of any one by legal process, in the same manner as the sheriff of a county may, if the prisoner was delivered by him; and this law was unrepealed, and in force, at the time of Miller's discharge. To entitle a debtor to a discharge under the insolvent law of January 1800, he must give the creditor thirty days' notice of his application, and take an oath that he is not worth thirty dollars, &c.

The jailor was bound to take notice of this law, and of the laws of Kentucky, which required him to detain the prisoner until he complied with these provisions: he knew the conditions of his bond, and acted at his peril in releasing him; without one day's confinement, without notice, oath, or the order of the district judge. The discharge was wholly unauthorised and illegal; the order of the justices did not protect the jailor; and he was liable to the plaintiff in an action for the escape, to the full amount of the execution.

The act of 1812, 2 Kent. Dig. 679, requires all jailors to execute, in their county court, a bond, with one or more approved sureties, in at least the sum of one thousand dollars,

and as much more as the court may deem proper; payable to the commonwealth, and conditioned for the faithful discharge of the duties of the office of jailor; which may be put in suit by any person injured by his acts. And the act of 1811 enacts, that where a bond is given by any public officer to the commonwealth, the recovery against the principal and his sureties shall not be limited to the penalty; but they shall be liable according to law, and to the full extent of the official obligations of such officer, as the same are enumerated in the condition of such bond. 2 Kent. Dig. 978.

The remedy thus afforded to the plaintiff was a substantial one; extending to his whole claim, if the jailor or his securities were solvent. It was not indirect, remote, or doubtful. He had acquired a new security, of which the assignor had a right to claim the benefit; but which he could not use for his protection: the plaintiff could alone sue for the escape, or bring an action on the jailor's official bond, which enured to his use, but not to the use of the defendant. If this new security had been a bond for the prison bounds, there would be no doubt that it would be his duty to pursue the parties to it before resorting to the defendant; and it was equally his duty to pursue the jailor, and his securities, on his bond of office.

The jailor had violated his duty; his bond became forfeited; he and his securities had put themselves in the place of the debtor, who was permitted to escape; and they thus assumed all his responsibility to the plaintiff. No event could arise by which they could be discharged. A voluntary return, or a recaption of the prisoner, would not avail them; they were under a stronger and more direct obligation to pay the money than special bail; against whom, it is admitted, that legal proceedings must be used with due diligence, before resorting to the assignor.

Although we find no express decision by the courts of Kentucky, enjoining on a plaintiff the necessity of suing a jailor and his securities for the escape of a prisoner; yet it seems to us, that, in the spirit of them all, he is bound to do so The general principle of all the cases is, that a plaintiff must pursue, with legal diligence, all his means and

remedies, direct, incidental or collateral, to recover the amount of his debt from the defendant, or any one who has put himself, or has by operation of law been put in his place. This the plaintiffs in this case have wholly omitted ; with a plain, undoubted cause of action against the jailor and his sureties; with legal means of compelling them to pay to the whole extent of their estates; and, for ought which appears, to the full amount of his claim against Miller, the maker of the note in question. They have made no attempt to assert their rights against either. According to the spirit and principle of the Kentucky decisions, we are constrained to say this is not due diligence; but that kind of legal negligence, which entitled the defendant to a judgment in his favour in the circuit court.

This view of the case renders it unnecessary to consider the effect of the proceedings on the second note; which were conducted with less diligence than those on the first.

Having thus disposed of the first error assigned by the plaintiff, it remains to consider the second ; which is, that the circuit court erred in rejecting the evidence offered of Miller's notorious insolvency at the time the note became due.

If the court are correct in overruling the exception taken to the charge of the circuit court, we cannot reverse their judgment for overruling this evidence. It did not conduce to prove any fact material to the issue between the parties; which was, not whether Miller was in fact insolvent; but whether the plaintiff had by due diligence ascertained his insolvency, by legal process commenced in time, diligently conducted till its final consummation, and by the exhaustion of all incidental and collateral remedies afforded by the law, without obtaining the debt. The proof, or the admission of actual insolvency, would in no wise relieve the plaintiffs from the duty imposed on them ; it would not accelerate their right to sue the defendant, or enlarge his obligation to pay, which did not arise by the mere insolvency of the maker of the note, but by its legal ascertainment in the manner prescribed by the judicial law of Kentucky. That law has been recognized by this court in the case of Weisiger, as appli-

[Bank of the United States *vs.* Tyler.]

cable to cases of this description. To decide now, that the plaintiffs could avail themselves of the insolvency of the maker, unaccompanied with the diligent use of all legal remedies; and in a case where we are of opinion that the plaintiffs have not made use of the diligence which under the circumstances of this case it was incumbent on them to use, would be to disregard all the principles of Kentucky jurisprudence, as evidenced by the received opinion, general practice, and judicial decisions of that state

We think it is not an open question, whether these principles shall be respected by this court; and cannot feel authorised to depart from them in a case to which their application cannot be questioned.

The judgment of the circuit court is therefore affirmed with costs.

This cause came on to be heard on the transcript of the record from the circuit court of the United States, for the seventh circuit and district of Kentucky, and was argued by counsel; on consideration whereof, it is ordered and adjudged by this court, that the judgment of the said circuit court in this cause be, and the same is hereby affirmed with costs.